UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | |
|---|---|
| DAVID HENLEY, ) | |
| ) | |
| Petitioner, ) | |
| ) | No. 1:05-CV-174/1:01-CR-148 |
| v. ) | |
| ) | Edgar/Carter |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |

REPORT AND RECOMMENDATION

I. Introduction

This matter is before the Court on a motion filed by David Henley ("Petitioner") to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. 4). In a Memorandum entered on August 14, 2008, the District Court found all Henley's claims without merit except for his claim alleging that his attorney affirmatively misadvised him as to his possible maximum sentence and failed to inform him that he faced the possibility of life in prison if he went to trial and was convicted. Finding that the record was inadequate to address this issue, the District Court referred the matter to the undersigned for an evidentiary hearing and a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) "regarding whether Henley's counsel misadvised him regarding his maximum possible sentence." I find petitioner's counsel did not misadvise him, and for the reasons stated herein, it is RECOMMENDED petitioner's claim be DISMISSED.

## II. Relevant Facts

*A. Background*

The procedural background of this case is set forth in detail in the District Court's Memorandum of August 14, 2008 (Doc. 20). Therefore, the undersigned shall not repeat it except where relevant to the issue at hand.

On August 28, 2001, petitioner was indicted by a United States Grand Jury on one count of conspiracy to distribute in excess of 500 grams of methamphetamine in violation of 21 U.S.C. § 846, two counts of intentionally using a telephone to facilitate a violation of 21 U.S.C. § 846 in violation of 21 U.S.C. § 843(b), and one count of possession with the intent to distribute in excess of 50 grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). A superseding indictment filed on October 10, 2001 added a count of brandishing a handgun during and in relation to the conspiracy to distribute methamphetamine in violation of 18 U.S.C §§ 924(c)(1)(A)(ii) and 2. After a trial held on February 12-15, 2001, the jury found petitioner guilty on Counts One, Four and Five of the Superseding Indictment but acquitted the defendant on the count relating to brandishing a handgun. The District Court sentenced petitioner to life imprisonment on Count One, forty-eight months of imprisonment on Count Four, and four hundred and eighty months on Count Five with the terms running concurrently. The sentences were based on the United States Sentencing Guidelines (USSG).

The sentence of life imprisonment is the particular focus of the undersigned. This sentence was based on a base offense level of thirty-six due to the fact that the offense involved between five and fifteen kilograms of a methamphetamine mixture. USSG § 2D1.1(c)(2). The Court gave a two level enhancement for carrying a dangerous weapon, USSG § 2D1.1(b)(1), a two level enhancement for obstruction of justice, USSG 3C1.1, and a three level enhancement

2

for Henley's leadership role in the conspiracy. USSG 3B1.1. Thus, even though petitioner had no prior criminal history, his sentencing level under the United States Sentencing Guidelines for Count One was forty-three mandating life imprisonment.

On February 9, 2009, the undersigned held an evidentiary hearing to address the issue referred to the undersigned by the District Court: did petitioner's counsel affirmatively misadvise petitioner as to his possible maximum sentence and fail to inform him that he faced the possibility of life in prison if he went to trial and was convicted.

*1. David Henley*

David Henley, petitioner, testified on February 9, 2009 to the following:

Attorney Lee Ortwein was appointed as petitioner's counsel on August 13, 2001, and represented him from his detention hearing through sentencing.[1] At his initial appearance on the first indictment, petitioner was informed that he faced ten years to life imprisonment for Counts One and Two. Prior the return of the second indictment, Mr. Ortwein discussed with him a "twenty-five year plea agreement" that had been offered by the government. Mr. Ortwein told petitioner that in order to obtain this plea agreement, he would have to give up all rights of appeal. He and Mr. Ortwein discussed the conviction rate in federal court being ninety-eight percent and the appellate turnover rate as being thirty-eight percent. Mr. Ortwein also told petitioner that under the *Apprendi* case, his sentence could be based only on evidence presented to the Grand Jury and that, based on that evidence, he could not be sentenced to more than thirty-two years. Mr. Ortwein never told him he could face life imprisonment if he went to trial and

---

[1]Petitioner's first detention hearing was held on August 13, 2001. [*See* Doc. 5] Trial commenced on February 12, 2002, [*see* Doc.52] and the verdict was entered on February 15, 2002 [*see* Doc. 56]. Sentencing proceedings were held on July 31, 2002 [*see* Doc. 72], and judgment was entered on August 6, 2002 [*See* Doc. 74].

3

lost; nor did he explain the plea bargaining deadline. Mr. Ortwein never talked to petitioner about enhancements under the United States Sentencing Guidelines and did not explain to him how relative conduct could affect sentences under the United States Sentencing Guidelines. Petitioner did not understand that his sentence could be enhanced by things he wasn't found guilty of by the jury.

Petitioner decided not to take the plea agreement for a number of reasons: he had never been arrested prior to this case, and Mr. Ortwein informed him that the most he faced as a sentence if he went to trial and lost was thirty-two years. He reasoned that if he went to trial, he was only facing seven more years than the maximum sentence he would have received had he accepted the plea agreement. He was twenty-three years old at the time, and he wasn't the person that the witnesses had made him out to be. He did not want to spend more time in jail than he had already been alive, and he did not believe he deserved a sentence of 25 years. He also did not want to give up all his rights to appeal.

At some point during the time petitioner was considering the plea agreement offered by the government, Mr. Ortwein told him he (Ortwein) had been informed that if petitioner did not agree to "plead guilty to twenty-five years," then the government would indict his father next. Petitioner talked with his father who said the government could go ahead because he hadn't done anything wrong. His father was never indicted. Mr. Ortwein then came back to petitioner and told him that if petitioner did not "plead guilty to twenty-five years," then the government would have him indicted on an additional charge of trafficking while brandishing a weapon. Despite these pressures, he refused to accept the plea agreement offered.

The petitioner further testified that during the course of his proceedings, Mr. Ortwein never gave him his discovery or showed him the United States Sentencing Guidelines. Nor did

4

Mr. Ortwein give him a copy of the proposed plea bargain agreement from the government. Mr. Ortwein was concerned that if he gave petitioner copies of these items, other inmates in the Hamilton County Jail where petitioner was incarcerated might have access to them and learn things about his case which might cause petitioner to talk about his case.

Petitioner did not know he faced life imprisonment until Mr. Ortwein presented him with the presentence report. At that time, Mr. Ortwein was "in shock" and called the probation officer a "Nazi." Even after receiving the presentence report, Mr. Ortwein continued to opine that petitioner would not receive a sentence of life imprisonment. After discussing the presentence report with Mr. Ortwein, petitioner was in an "emotional breakdown stage," so he cannot remember clearly what was discussed. Following the sentencing proceeding in which petitioner received life imprisonment, Mr. Ortwein told him that the judge would have sentenced him to thirty years if he had not blown a kiss to the Assistant United States Attorney in court.

Mr. Ortwein came to see him ten to 15 times prior to trial while he was in the Hamilton County Jail. However, at no time did Mr. Ortwein inform him he had any other choice besides the "twenty-five year plea agreement" or going to trial. He did not know he had the choice to take a "straight plea," that is to enter a notice of intent to plead guilty and preserve his right to appeal. He definitely would have considered entering a straight plea because he did not want to give up his right to appeal.

Petitioner denied seeing a letter dated October 8, 2001, from Mr. Ortwein discussing his possible sentences including life imprisonment. He stated he saw the October 8, 2001 letter for the first time the day of the February 9, 2009 evidentiary hearing.

Upon cross-examination, petitioner admitted he lied at trial numerous times. For example, he lied when he testified he did not receive methamphetamine from Sophan Luy. He

5

lied when he testified he was not involved in a conspiracy to distribute more than 500 grams of methamphetamine, and he lied when he denied distributing methamphetamine to Brian Sanders. He also admitted that he lied at trial about an incident after his arrest when he was supposed to be cooperating with law enforcement by phoning his supplier in Atlanta, an individual named "K" or "Kong." At trial, the defendant lied by testifying he did not telephone his supplier, rather he simply picked a 404 number and dialed it – a ruse, he testified falsely at trial, he carried out in order to appear like he was cooperating with law enforcement. Petitioner denied at the February 9, 2009 evidentiary hearing that Sophan Luy brought him two pounds of methamphetamine per month, asserting instead that Sophan Luy did not testify truthfully at trial on this matter.

### 2. Elizabeth Henley

Elizabeth Henley is petitioner's mother. In the summer of 2001, Henley was arrested and Lee Ortwein was appointed counsel. After her son's arrest, she "collapsed" and "was in clinical shock." She and her husband met with Mr. Ortwein on several occasions, some at his office and some on the phone. They discussed with Mr. Ortwein what would happen during the legal proceedings against her son. In one conversation, Mr. Ortwein told them a twenty-five year plea agreement had been offered and that petitioner had elected not to take it because he would not receive much more than twenty-five years if he went to trial and was convicted. Mr. Ortwein further told her that if he took the "twenty-five year plea agreement," her son would have to give up a number of rights and he would have to testify in court for the government. She could not remember where this conversation took place. Mr. Ortwein never mentioned the possibility of a life sentence for her son. Mr. Ortwein assured her that if petitioner went to trial, the stiffest sentence he faced was thirty to thirty-five years in prison. She first learned about the possibility of a life sentence on the same day as her son, the day he received the presentence report. If she

6

had known that her son would receive life imprisonment, she would have encouraged him to take the plea agreement. Mr. Ortwein never spoke to her about a third option which was simply to plead guilty.

On cross-examination, Elizabeth Henley admitted that she was present at the arraignment but stated she did not hear the court explain that her son faced a possible sentence of ten years to life imprisonment.

### 3. Lee Ortwein

Lee Ortwein testified as follows: at the time of the defendant's arrest, he had approximately three years of experience practicing criminal law in federal and state courts, and he had participated in five to six trials. On August 13, 2001, petitioner was arrested on a complaint and warrant. On August 15, 2001, Mr. Ortwein, who had been appointed to represent petitioner, visited petitioner at the Hamilton County Jail. He discussed the upcoming legal proceedings and process with petitioner and while he did so, he scribbled notes on a piece of paper. (Gov. Ex. 1 at 4)[2]. Mr. Ortwein wrote on the paper, among other things, "500 g" and "10-L." These notations were made when he explained to petitioner that petitioner faced ten years to life imprisonment for the charges against him.

On October 3, 2001, Mr. Ortwein met with the case agent, Agent Mitchell Smith and Perry Piper, the Assistant United States Attorney (AUSA) assigned to prosecute this case. During that meeting, he learned about the information, testimony, and evidence that the

---

[2]The Government's Exhibit 1 is a collective exhibit containing a one page memorandum to the "David Henley File," a two page letter from Mr. Ortwein to petitioner dated October 8, 2001, one page on lined paper with "scribbles" or drawings as described by Mr. Ortwein during his February 9, 2009 testimony, and a six page document entitled "Plea Agreement" in the case of *United States v. David E. Henley*, 101-cr-148.

7

government had against petitioner. He memorialized this meeting with a memorandum he placed in petitioner's file. (*See* Govt. Ex. 2).

Mr. Ortwein discussed the proposed plea agreement with petitioner on October 4 or 5, 2001. Petitioner mentioned nothing about not wanting to waive appeal rights. He simply said he didn't want to enter into a plea agreement because he wasn't guilty. Mr. Ortwein told petitioner that if the government produced the evidence it said it had, then he would probably receive a life sentence. Mr. Ortwein also told petitioner that if cooperating with the government was a problem and an impediment to entering into a plea agreement, then he would talk to AUSA Piper to see if he could have the language stricken. Mr. Ortwein also told petitioner he could simply plead guilty without entering into an agreement. Mr. Ortwein also remembers telling petitioner that *Apprendi* would have no impact on the sentence at that time and to ignore it because the guidelines were still mandatory. Despite Mr. Ortwein's urging, petitioner on repeated dates refused to accept a plea agreement saying he was not guilty. At trial, AUSA Piper spoke to Mr. Ortwein to urge him to ask petitioner to enter a plea. Mr. Ortwein did so, but still petitioner rejected the plea.

Mr. Ortwein also documented his discussions with petitioner in a memorandum entitled "TO: DAVID HENLEY FILE" "RE: CLIENT DISCUSSIONS THROUGH OCTOBER 5." (Gov. Ex. 1 at 1). In this memorandum, Mr. Ortwein states he reviewed the plea offer with the client. He explained the minimum ten years mandatory sentence and the maximum of life and reviewed the application of the guidelines on the case, advising petitioner that if the government's claims are proven through their witnesses, petitioner would start at a level 36, receive two additional levels for the gun, three or four additional levels for his leadership/management role, and, if he testifies as he then intended to do, there would probably

8

be an additional two levels for obstruction of justice. (Gov. Ex. 1 at 1). Mr. Ortwein also discussed with petitioner possible sentences if he pled thereby receiving "3 levels off for acceptance and nothing for obstruction. Told him the estimates of the range [sic] is really guess work in the event he pleads because we can't know whether the government would or would not go to the trouble of bringing in all of its drug quantity witnesses." (Gov. Ex. 1 at 1).

Mr. Ortwein sent a letter to petitioner on or about October 8, 2001, explaining to him the advantages and disadvantages of accepting or not accepting the plea agreement. In the first paragraph of the letter, Mr. Ortwein advised, "[b]ased on your statement and the evidence Mr. Piper says he will present at trial, which includes other defendants who claim they dealt with you, if you are convicted your guideline range will likely result in a life sentence." (Gov. Ex. 1 at 2). The letter also advised petitioner that AUSA Piper intended to bring an additional charge "related to the gun which could add another seven years in prison" if petitioner insisted on going to trial. (Gov. Ex. 1 at 2). The second to the last paragraph of the letter discussed the benefits if petitioner were to accept the plea agreement such as a reduction under the guidelines for acceptance of responsibility as well as "generally, when a person pleas [sic] the government does not bring in all of the available witnesses thereby reducing their guideline range." (Gov. Ex. 1 at 2). The letter also advises that the agreement requires petitioner to tell the government about all the criminal activity he has been involved in to help prosecute others, and if he does so, he may be able to obtain a reduction in sentence. (*See* Gov. Ex. 1 at 2 for the complete language). Mr. Ortwein saw his client a day or two after he sent the October 8, 2001 letter, and they discussed it. Mr. Ortwein also took a copy of the proposed plea agreement to petitioner. Mr. Ortwein read it to him, reviewed it with him, and summarized it for him. He tried to give petitioner a copy but

9

petitioner did not want a copy. Mr. Ortwein then tried to convince petitioner to plead guilty, but petitioner refused to do so saying he was not guilty.

No-one told Mr. Ortwein that petitioner's father, David Henley, Sr. would be indicted if petitioner did not accept the plea agreement offered. However, Mr. Ortwein was told law enforcement suspected David Henley, Sr. knew or was somehow involved in the drug trafficking. Ortwein had several conversations with petitioner's parents in his office and on the phone. He told them he could not guarantee a sentence and that, if he did, they needed to find a new lawyer. He told them that their son could potentially receive a life sentence if he went to trial.

Mr. Ortwein wasn't surprised when the presentence report came back with a sentence level of 44 mandating life imprisonment, but he wasn't happy about it either. He may have, in fact, called the probation officer a Nazi though he doesn't remember doing so.

### III. Analysis

Failure to accurately advise a client regarding the various factors to be considered when deciding whether to accept a plea agreement, such as the maximum possible sentence if one proceeds to trial and loses, amounts to ineffective assistance of counsel. *(See* District Court's August 14, 2008 memorandum and cases cited therein, Doc. 20 at pp. 16-18).

If one were to believe petitioner, then petitioner would prevail on his claim of ineffective assistance of counsel brought on the ground that counsel affirmatively misadvised him about the possible consequences of going to trial. However, I do not find petitioner credible. He admitted in this hearing that he lied numerous times to the jury at the trial of his case. At the February 9, 2009 hearing, he continued to minimize his involvement in the conspiracy for which he was convicted. For example, he denied that Sophan Luy testified truthfully at trial about the amount of methamphetamine Luy supplied petitioner – testimony the District Court credited at

10

sentencing. As petitioner demonstrated amply at trial, he has no compunction in fabricating facts if it is advantageous for him to do so. Thus I do not believe petitioner was telling the truth on February 9, 2009, regarding what Mr. Ortwein told him about the sentence he faced if he went to trial.

On the other hand, I find Mr. Ortwein credible. His testimony is consistent with his memoranda and letter in his file, and I could discern no reason to doubt his truthfulness.

Mr. Ortwein fully apprised petitioner of the details of the plea agreement and the fact that he faced a likely life sentence if he did not accept the plea agreement. Mr. Ortwein reviewed with petitioner how the sentencing guidelines might apply to petitioner's case based on the particular facts of his case. He also told petitioner of the option to make a "straight plea." Mr. Ortwein discussed several times with petitioner the possibility of a life sentence and strongly recommended he accept the plea agreement offered by the government. There were no promises petitioner would receive a sentence of no greater than 32 years if he were convicted at trial. Petitioner's decision to proceed to trial was not the result of incomplete or inaccurate information from his attorney regarding his potential punishment if he did or did not plead guilty.

While Mrs. Henley may have been in earnest in her testimony on February 9, 2009, she was not present on the numerous occasions when Mr. Ortwein met with her son at the Hamilton County Jail. She cannot know what Mr. Ortwein did or did not say. Further, Mrs. Henley testified she was "in clinical shock" after her son's arrest and was therefore likely having difficulty absorbing all the information supplied to her and accurately recalling who told her what and when. I do not believe that Mr. Ortwein informed Mrs. Henley that the most her son would receive if he was found guilty at trial was 30 to 35 years – though doubtless she did hear that

11

from some source. I conclude her testimony does not undermine Mr. Ortwein's testimony in this matter.

## IV. Conclusion

Mr. Ortwein effectively and accurately communicated to petitioner all information petitioner needed to make an informed decision regarding whether to go to trial, to accept the plea agreement from the government, or to plead guilty without entering into the plea agreement. He certainly informed petitioner he faced likely life imprisonment if convicted. I therefore conclude petitioner's claim of ineffective assistance of counsel in this matter is meritless and RECOMMEND this claim be DISMISSED.[3]

Dated: February 23, 2009        s/William B. Mitchell Carter
                                UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7, 106 S. Ct. 466, 472 n.7, 88 L. Ed. 2d 435 (1985). The district court need not provide de novo review where objections to this Report and Recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).